**IN THE UNITED STATES COURT OF APPEALS**

**FOR THE FIFTH CIRCUIT**

No. 12-20306

United States Court of Appeals
Fifth Circuit

**F I L E D**

May 14, 2013

Lyle W. Cayce
Clerk

KENYON INTERNATIONAL EMERGENCY SERVICES, INCORPORATED,

Plaintiff–Appellant,

versus

MARK MALCOLM; GRADY BRAY; RONALD CRANE, JR.;
DISASTER MANAGEMENT INTERNATIONAL CORPORATION;
CRISIS HUMAN SERVICES, INCORPORATED; MARJORIE BRAY;
LEAH HAWLEY; KATHY ROCK; JAMES FAIRBROTHER;
SHARON FAIRBROTHER;
BRAY ASSOCIATES, Doing Business as Grady Bray,

Defendants–Appellees.

Appeal from the United States District Court
for the Southern District of Texas
USDC No. 4:09-CV-3550

No. 12-20306

Before STEWART, Chief Judge, SMITH and WIENER, Circuit Judges.

JERRY E. SMITH, Circuit Judge:[*]

Kenyon International Emergency Services, Inc. ("Kenyon"), sued the various defendants to enforce non-competition clauses ("NCCs"). The district court granted summary judgment and attorney's fees for defendants and sanctioned Kenyon's attorney, Dax Faubus. Kenyon appeals the fee award, which we affirm; we reverse the order imposing sanctions.

I.

Kenyon provides emergency services for governments and companies that have suffered mass-casualty catastrophes. Because mass casualties are rare, most of its employees are independent contractors. For example, from 2005 to 2008, defendant Mark Malcolm worked about seventy-five full or partial days of intermittent disaster response for Kenyon. All individual defendants except Grady Bray and, for a short time, Kathy Rock were part-time and worked for Kenyon substantially less than Malcolm did.

In connection with their work for Kenyon, defendants Malcolm, Rock, Ronald Crane, Jr., and Marjorie Bray signed activation agreements containing NCCs. In 2009, several independent contractors left Kenyon or started to work on their own.

II.

Kenyon sued eight of the independent contractors and some of their affiliated companies under eleven legal theories. Protracted proceedings ensued.

---

[*] Pursuant to 5TH CIR. R. 47.5, the court has determined that this opinion should not be published and is not precedent except under the limited circumstances set forth in 5TH CIR. R. 47.5.4.

No. 12-20306

In February 2010, the district court issued a detailed opinion denying Kenyon injunctive relief. It found that "[t]he [NCC] is unenforceable because it is too broad in all respects: it does not limit the area, the tasks, or the time that it prohibits its employees from competing with it."[1] On appeal, this court affirmed.[2]

In June 2010, pursuant to Texas Business and Commerce Code § 15.51(c), the district court awarded the eight defendants attorney's fees and costs incurred "in defending against Kenyon's attempt to enforce a covenant not to compete that was unsupported by the contract, facts, or beyond rationality in its breadth."[3] In March 2011, the court awarded defendants supplemental fees in connection with their defense of Kenyon's first appeal.

In December 2011, the district court granted summary judgment on all remaining claims.[4] Defendants sought post-judgment discovery based on their theory that Kenyon was seeking to evade the fee award by selling its assets and fleeing the jurisdiction. Attached to defendants' motion was an affidavit from defendant Grady Bray that conveyed various anecdotes relating to the supposed "long range plan" of Kenyon to relocate to the United Kingdom, including information provided by a former Kenyon vice-president ("Employee A").

Kenyon's response characterized defendants' allegations as "absurd" and "utterly false." Kenyon averred that it "recently discharged two employees, including [Employee A], for performance reasons. . . . [Employee A] was first

---

[1] *Kenyon Int'l Emergency Servs., Inc. v. Malcolm,* No. H-09-3550, 2010 WL 452745, at *4 (S.D. Tex. Feb. 8, 2010).

[2] *Kenyon Int'l Emergency Servs., Inc. v. Malcolm*, 400 F. App'x 893, 894 (5th Cir. 2010) (per curiam).

[3] *Kenyon Int'l Emergency Servs., Inc. v. Malcolm*, No. H-09-3550, 2010 WL 2303328, at *1 (S.D. Tex. June 7, 2010). The district court also denied Kenyon's motion to compel arbitration, and we affirmed. 421 F. App'x 413, 413 (5th Cir. 2011) (per curiam).

[4] *Kenyon Int'l Emergency Servs., Inc. v. Malcolm*, No. H-09-3550, 2011 WL 6206766 (S.D. Tex. Dec. 13, 2011).

No. 12-20306

reprimanded and demoted . . . [and] subsequently discharged . . . for failing to correct his non-performance." Attached to Kenyon's response were (1) an affidavit from Kenyon's president, Jerry Novosad; (2) a reprimand letter from Kenyon's Chief Executive Officer Robert Jensen to Employee A; and (3) a two-page email that contained the record of a sexually-explicit Internet chat between two individuals. The username of one of the chat participants was identical to the first name of Employee A. The email was not sealed when filed.

At a subsequent hearing, the district court engaged in an extended colloquy with Kenyon's attorney about the explicit email. Near the end of the hearing, the court stated that "for having filed the irrelevantly scurrilous e-mail, Mr. Faubus, you will contribute $3,500 to the Center for AIDS Research . . . ." Later that same day, the district court *sua sponte* entered an "Order on Sanctions," stating in its entirety:

> Dax Faubus must give $3,500 to:
>
> Center for AIDS Research
> Baylor College of Medicine–UTHouston Medical School
> One Baylor Plaza
> Houston, TX 77030-3411

The court also entered final judgment consolidating its two previous awards of attorney's fees to defendants.

## III.

The district court awarded attorney's fees and prejudgment interest pursuant to Texas and Business and Commerce Code § 15.51(c), which provides:

> If the primary purpose of the agreement to which [a] covenant [not to compete] is ancillary is to obligate the promisor to render personal services, the promisor establishes that the promisee knew at the time of the execution of the agreement that the covenant did not

contain limitations as to time, geographical area, and scope of activity to be restrained that were reasonable and the limitations imposed a greater restraint than necessary to protect the goodwill or other business interest of the promisee, and the promisee sought to enforce the covenant to a greater extent than was necessary to protect the goodwill or other business interest of the promisee, the court may award the promisor the costs, including reasonable attorney's fees, actually and reasonably incurred by the promisor in defending the action to enforce the covenant.

Kenyon contends that because an award of attorney's fees under Section § 15.51(c) is conditioned on defendants' meeting evidentiary burdens, the district court's ruling is akin to a summary-judgment motion, so the standard of review is *de novo*. The authorities cited by Kenyon establish merely that *summary judgments* are reviewed *de novo*.[5] Kenyon cites no authority that the fee award is akin to a summary-judgment motion. We review attorney's fees for abuse of discretion and underlying factual determinations for clear error. *Mathis v. Exxon Corp.*, 302 F.3d 448, 461–62 (5th Cir. 2002).

The NCC is contained in Section 10 of the activation agreements signed by Malcolm, Rock, Crane, and Marjorie Bray:

> Team Member shall not actively or passively solicit for employment purposes, attempt to recruit, or hire directly, through third parties or for third parties any other Team Member of employee of Kenyon. Nor will Team Members utilize their position with Kenyon or experience gained while working for Kenyon to solicit or obtain contracts or work that will compete with Kenyon for a period of at least one year has elapsed following effective termination of this Agreement, or until a period of one year has elapsed following termination of any Client contract on which Kenyon has worked in any commercial, management, advisory or technical capacity, whichever is the latter, without the prior written consent of the other party.

As explained, we have already affirmed the denial of injunctive relief, which was

---

[5] *See Olander v. Compass Bank*, 363 F.3d 560, 564 (5th Cir. 2004) (citing *Frank v. Xerox Corp.*, 347 F.3d 130, 135 (5th Cir. 2003)).

based in part on the district court's conclusion that "[t]he [NCC] is unenforceable because it is too broad in all respects: it does not limit the area, the tasks, or the time that it prohibits its employees from competing with it."[6] The subsequent grant of summary judgment, which Kenyon does not appeal, reiterated that finding.[7] Kenyon also does not appeal the refusal to segregate costs or the award of attorney's fees to defendants who did not sign activation agreements.

Thus, the only remaining issue is whether the district court abused its discretion by concluding that defendants made a sufficient showing under Section 15.51(c). Kenyon contends the court erred in imposing attorney's fees because (1) "[t]here is no evidence that [Kenyon] knew the [NCCs] were unreasonable in time, geography and scope at the time they were executed" and (2) Kenyon "did not attempt to enforce [Defendants]' [NCC] to a greater extent than was necessary to protect its goodwill and other business interests."

## A.

Kenyon avers that defendants had the burden, which they failed to carry, of showing that Kenyon had actual knowledge of the NCC's unreasonableness. The plain language of Section 15.51(c), however, indicates that the key determination is Kenyon's knowledge of *reasonable limits*, not—as Kenyon suggests—its knowledge of the *reasonableness of the agreement*. A party seeking attorney's fees is required to establish that the opposing party "knew at the time of the execution of the agreement that the covenant did not contain limitations . . . that were reasonable." § 15.51(c).

Kenyon's CEO, former president, and majority owner Jensen testified extensively regarding his understanding of the NCCs: that they were worldwide,

---

[6] *Kenyon*, 2010 WL 452745, at *4.

[7] *Kenyon*, 2011 WL 6206766, at *1.

overreaching in scope of activity, and basically indefinite in time. Because Kenyon knew the NCC at issue had essentially *no* limitations, *a fortiori* it knew that the clause did not contain reasonable limitations.[8] As the district court put it:

> Kenyon knew when the agreements were signed that the covenants were unreasonable. Kenyon's knowledge of the clause's baseless expansionism can be inferred from its breadth. The same covenant applied to two-day workers and multi-year ones equally. That it is a worldwide restriction is open and obvious. That it continues as long as the client has business with Kenyon is clearly excessive. Kenyon knew what it taught people, where they had worked, and what they did. Kenyon knew it was imposing total, gratuitous limits on people whom it did not equip, train, or imbue with its goodwill. The [NCC] is unreasonable on its face; Kenyon operated on no mistaken fact.[9]

On appeal, Kenyon relies on two district-court decisions. In *Safeworks, LLC v. Max Access, Inc.*, No. H-08-2860, 2009 WL 959969, at \*7 (S.D. Tex. Apr. 8, 2009), the court denied attorney's fees on summary judgment because "there is no evidence SafeWorks representatives actually knew that the relevant non-solicitation provisions were unreasonable under Texas law." Relying on *Safeworks*, the court in *Rimkus Consulting Group, Inc. v. Cammarata*, 688 F. Supp. 2d 598, 678 (S.D. Tex. 2010), also denied summary judgment:

> Evidence that [an employer] knew about [an employee's] responsibilities and location is insufficient to establish that [the employer] knew that the noncompetition and nonsolicitation provisions of the Agreement contained unreasonable provisions. Although Texas case law on noncompetition and nonsolicitation restrictions was clear in 1996, there is no evidence that [the employer] knew that the relevant provisions of [the employee's] Employment Agreement were unreasonable under Texas law.

---

[8] In its reply brief, Kenyon maintains for the first time that Jensen's testimony is not attributable to Kenyon. That contention is waived. *United States v. Brown*, 305 F.3d 304, 307 n.4 (5th Cir. 2002) (per curiam) ("This Court will not consider a claim raised for the first time in a reply brief.").

[9] *Kenyon*, 2010 WL 2303328, at \*1.

No. 12-20306

The procedural posture of *Safeworks* and *Rimkus* makes them easily distinguishable: In both, the district court was faced with a motion for summary judgment. Here, we are reviewing an award of attorney's fees for abuse of discretion.

Assuming without deciding that *Safeworks*'s "actual knowledge" requirement is an accurate statement of Texas law, it follows that Kenyon's knowledge of the NCC's overbreadth cannot be inferred merely from its text.[10] Even so, the *factual findings* underlying the fee award were not clearly erroneous. In his deposition, Jensen expressed an understanding of the NCCs as "worldwide" "until [the district court] told us otherwise"; Jensen indicated that the NCC was intended to keep Kenyon's contractors from working for a competitor in any capacity, even if they had not performed the same function for Kenyon; and Jensen agreed with a characterization that the NCC was intended to "run indefinitely." Based on that testimony, the district court's conclusion that "Kenyon knew when the agreements were signed that the covenants were unreasonable" is "plausible in light of the record viewed as a whole . . . . "[11]

---

[10] *Contra id.* Although we apply it here only *arguendo*, we note that the "actual knowledge" standard urged by Kenyon would render the attorney's fees provision of Section 5.51(c) essentially toothless. Parties could evade the consequences of unreasonably restraining trade so long as they refrained from acquiring actual knowledge of what is in their contracts or remained ignorant of longstanding Texas law. *See Wackenhut*, 793 S.W.2d at 684 (noting that the subchapter governing covenants not to compete was enacted in 1989). As Jensen's testimony demonstrates, it is unlikely that an employee could ever show that an employer—even a sophisticated one—had contemporaneous actual knowledge that an NCC did not contain reasonable limitations:

> [Lawyer for Defendants]: What did you do . . . to convince yourself that the [NCC] . . . would be enforceable?
>
> [Jensen]: I hired and paid a bar-certified counsel in Texas to do the work, and I assume the work he did was within the confines of the law.

[11] *Bertucci Contracting Corp. v. M/V ANTWERPEN*, 465 F.3d 254, 258 (5th Cir. 2006).

No. 12-20306

B.

To obtain attorney's fees, defendants were required to show that Kenyon "sought to enforce the covenant to a greater extent than was necessary to protect [its] goodwill or other business interest . . . ." § 15.51(c). Kenyon does not appeal the determination that the NCCs were "unreasonable and unenforceable" because they were "too broad on all three limitations: time, scope, and geography."[12]  Kenyon's briefing focuses on the numerous times it suggested reformation.

In its first verified pleading, however, Kenyon sought to enforce the NCCs "as worded"; it follows that Kenyon sought to enforce them "to a greater extent than was necessary . . . ." § 15.51(c).  That Kenyon sought reformation both alternatively and subsequently is of no moment:  The finding that "Kenyon attempted to enforce the non-competition clause to the greatest extent possible"[13] was not clearly erroneous.  The district court did not abuse its discretion by awarding attorney's fees.

IV.

We next consider whether we have jurisdiction over attorney Faubus's appeal of the sanctions order.[14]  Kenyon's notice of appeal ("NOA") stated it appealed "from the March 29, 2012 Order on Sanctions . . . and the March 29, 2012 Final Judgment . . . rendering a take nothing judgment against Kenyon . . . and awarding attorney's fees to Defendants."  The NOA was signed by Dax Faubus as "Attorney-in-Charge for Kenyon" and did not list Faubus as a cap-

---

[12] *Kenyon*, 2011 WL 6206766, at *4.

[13] *Kenyon*, 2010 WL 2303328, at *1.

[14] *See Martin v. Halliburton*, 618 F.3d 476, 481 (5th Cir. 2010) ("We have jurisdiction to determine our own jurisdiction.").

tioned party. Faubus initially filed two appellate briefs: one on behalf of Kenyon challenging the fees and one on his own behalf attacking the sanctions. Faubus subsequently filed an opposed motion to submit a single, amended brief addressing both fees and sanctions. The amended brief was accepted for filing, and the issue of whether Faubus is an appellant was carried with the case.

"An appeal must not be dismissed for informality of form or title of the [NOA], or for failure to name a party whose intent to appeal is otherwise clear from the notice." FED. R. APP. P. 3(c)(4). Because Faubus, not Kenyon, was the subject of sanctions, Faubus's intent to appeal the sanctions order is clear from the NOA he submitted on behalf of Kenyon.[15]

"We consider not only the notice, but also the appellant's brief, in determining the fairly inferred scope of the appeal." *Williams v. Henagan*, 595 F.3d 610, 616 (5th Cir. 2010) (per curiam). Both the NOA and Kenyon's amended brief address the sanctions order. We have jurisdiction to entertain Faubus's appeal, and we treat Kenyon's amended appellate brief as filed on behalf of Kenyon and Faubus.[16]

## V.

The district court's written order does not specify the basis for sanctions, although its oral statement indicates they were imposed for Faubus's "having filed the irrelevantly scurrilous e-mail" that graphically documented Employee A's sexual practices.

There are three possibilities. First, Federal Rule of Civil Proce-

---

[15] *See Garcia v. Wash,* 20 F.3d 608, 609–10 (5th Cir. 1994) (per curiam) (finding jurisdiction to entertain an appeal from sanctions imposed on an attorney even though "he was not formally named as a party in any of the notices of appeal").

[16] *See* FED. R. APP. P. 3(b)(1) ("When two or more parties are entitled to appeal from a district-court judgment or order, and their interests make joinder practicable, they may file a joint [NOA]. They may then proceed on appeal as a single appellant.").

No. 12-20306

dure 11 permits a court to sanction an attorney for a pleading or other document that (among other potential transgressions) is presented for an improper purpose or makes factual representations that are without reasonable evidentiary support.  *See* FED. R. CIV. P. 11(b)(1) and (3), (c).  Second, under 28 U.S.C. § 1927, an attorney "who so multiplies the proceedings in any case unreasonably and vexatiously" may be held to account for the excess fees and other costs resulting from her improper conduct.  Finally, a court has the inherent authority to impose sanctions . . . .

*Johnson v. Cherry*, 422 F.3d 540, 548 (7th Cir. 2005).  Section 1927 is inapposite here, which leaves two candidates:  Rule 11 and inherent power.  We review sanctions imposed under both Rule 11 and the court's inherent power for abuse of discretion.[17]

## A.

Assuming the sanctions were imposed pursuant to Rule 11, the district court committed reversible error by failing to issue a show-cause order.[18] Although the court engaged in a colloquy with Faubus about the offending filing, that extended discussion falls short of satisfying Rule 11(c)(3)'s show-cause requirement.  Until the end of the hearing, Faubus was never put on notice that sanctions were at issue, nor did he have a chance to contest their imposition orally or in writing.[19]  "Providing [a sanctioned party] with an opportunity to

---

[17] *Marlin v. Moody Nat'l Bank, N.A.*, 533 F.3d 374, 377 (5th Cir. 2008) ("Rule 11 sanctions are reviewed for abuse of discretion."); *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc. ("Natural Gas II")*, 86 F.3d 464, 467 (5th Cir. 1996) ("We review . . . sanctions imposed under a court's inherent powers under the abuse of discretion standard.").

[18] *See* FED. R. CIV. P. 11(c)(5)(B); *see also Marlin*, 533 F.3d at 379.

[19] *See* FED. R. CIV. P. 11 Advisory Committee's Note (1993 Amendments) ("Explicit provision is made for litigants to be provided notice of the alleged violation and an opportunity to respond before sanctions are imposed.  Whether the matter should be decided solely on the basis of written submissions or should be scheduled for oral argument (or, indeed, for evidentiary presentation) will depend on the circumstances.").

No. 12-20306

mount a defense 'on the spot' does not comport with due process." *1488, Inc. v. Philsec Inv. Corp.*, 939 F.2d 1281, 1292 (5th Cir. 1991).

Some of the defendants rely on Rule 11(c)(3)'s conditional language ("may order") for the proposition that notice and an opportunity to respond are discretionary. That interpretation misreads the rule: Issuing a show-cause order is a mandatory prerequisite to imposing monetary sanctions *sua sponte*.[20]

B.

Federal courts possess wide-ranging implicit authority incident to "'The judicial Power.'"[21] As a general matter, the Federal Rules of Civil Procedure have not displaced the inherent power to impose sanctions.[22] "[T]he inherent power springs from the well of necessity, and sparingly so." *Natural Gas I*, 2 F.3d at 1407. We look skeptically on the imposition of sanctions *sua sponte* "without explanation as to why [a particular sanction] was necessary to accomplish the court's legitimate . . . purpose." *Natural Gas II*, 86 F.3d at 468.

In *Corley v. Rosewood Care Center, Inc.*, 142 F.3d 1041, 1058–59 (7th Cir. 1998), the court addressed a similar sanction:

> [I]f the court was relying on its inherent power to sanction a bad-faith filing, it should have specifically so stated, along with delineat-

---

[20] *See* FED. R. CIV. P. 11 (c)(5)(B) ("The court *must not* impose a monetary sanction . . . on its own, unless it issued the show-cause order under Rule 11(c)(3) . . . .") (emphasis added).

[21] *Natural Gas Pipeline Co. of Am. v. Energy Gathering, Inc. ("Natural Gas I")*, 2 F.3d 1397, 1406 (5th Cir. 1993) (quoting U.S. CONST., Art. III, § 1); *see also Anderson v. Dunn*, 19 U.S. (6 Wheat.) 204, 227 (1821) ("Courts of justice are universally acknowledged to be vested, by their very creation, with power to impose silence, respect, and decorum, in their presence, and submission to their lawful mandates . . . .").

[22] *See Chambers v. NASCO, Inc.*, 501 U.S. 32, 46 (1991) ("[O]ther mechanisms, taken alone or together, are not substitutes for the inherent power, for that power is both broader and narrower than other means of imposing sanctions."); *see also* FED. R. CIV. P. 11 Advisory Committee's Note (1993 Amendments) (citing *Chambers* in support of the proposition that Rule 11, as amended in 1993, "does not inhibit the court . . . in exercising its inherent powers").

ing its reasons for finding bad faith. The court also should have explained why Rule 11 was inadequate to serve the court's purposes, for as the Supreme Court observed in *Chambers*, "when there is bad-faith conduct in the course of litigation that could be adequately sanctioned under the Rules, the court ordinarily should rely on the Rules rather than the inherent power." 501 U.S. at 50 . . . .

We agree that "even if Rule 11's . . . procedural requirements [do] not strictly curtail the procedures necessary for a sanction under the inherent power, even that type of sanction requires notice and an opportunity to respond." *Id.* at 1059. Because Faubus was afforded neither, the sanctions order could not stand procedurally even if it were otherwise sound.

## VI.

We therefore address, for abuse of discretion,[23] the merits of the sanctions order to determine whether we remand for a show-cause proceeding or reverse the order *sine die.* In *Chambers*, 501 U.S. at 51, the Court affirmed the district court's resort to inherent power against a party whose "conduct sanctionable under the Rules was intertwined within conduct that only the inherent power could address." Faubus's filing of an "irrelevantly scurrilous e-mail," even if sanctionable, was not "beyond the reach of the Rules."[24] Rather, it was well within the scope of Rule 11(b)(1), pursuant to which a district court may sanction an attorney for presenting a document for "any improper purpose . . . ."

Rule 11, therefore, provides the only plausible basis for the sanctions. "[A] district court is not to read an ulterior motive into a document" unless "the improper purpose is objectively ascertainable." *Whitehead*, 332 F.3d at 805.

---

[23] *See Whitehead v. Food Max of Miss., Inc.*, 332 F.3d 796, 802–03 (5th Cir. 2003) (en banc); *Natural Gas II*, 86 F.3d at 467.

[24] *Chambers*, 501 U.S. at 51; *see* FED. R. CIV. P. 11 Advisory Committee's Note (1993 Amendments) ("*Chambers* cautions . . . against reliance upon inherent powers if appropriate sanctions can be imposed under provisions such as Rule 11 . . . .").

No. 12-20306

[I]n determining compliance *vel non* with each obligation [of Rule 11], the standard under which an attorney is measured is an objective, not subjective, standard of reasonableness under the circumstances.  Our emphasis on an objective inquiry has been emphatic; we have expressly rejected any subjective inquiries into the motivation behind a filing . . . .[25]

In *Whitehead*, for example, the sanctioned attorney attempted to execute a judgment against Kmart "by seizing currency in the cash registers and vault," with "media representatives and two United States Marshals" in tow. *Id.* at 800. "In ascertaining [an improper] purpose, we implied that the sanctioned party would *not* have acted as he did in the absence of the improper purpose." *Maxxam*, 523 F.3d at 585 (5th Cir. 2008).

Faubus has consistently maintained that his sole purpose in filing the explicit email was to demonstrate that Employee A's termination was for cause rather than part of Kenyon's plan to flee the jurisdiction.  The district court characterized Faubus's unsealed filing of the offending document as "a vicious, deliberate smear."  Whatever might have been the negative *effect* on Employee A's public reputation, however, we can discern no improper *purpose* in Faubus's zealous representation of his client.  Because the district court "based its ruling . . . on a clearly erroneous assessment of the evidence," *Whitehead*, 332 F.3d at 803 (internal quotation marks omitted), we reverse the sanctions order.

Accordingly, the order granting attorney's fees is AFFIRMED.  The order imposing sanctions is REVERSED.

---

[25] *Fed. Deposit Ins. Corp. v. Maxxam*, 523 F.3d 566, 581 (5th Cir. 2008) (alterations in original) (footnote and internal quotation marks omitted).

14